# AGOSTO *v.* IMMIGRATION AND NATURALIZATION SERVICE

No. 76–1410. Argued February 28, 1978—Decided June 6, 1978

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 761.

*Robert S. Bixby* argued the cause and filed briefs for petitioner.

*Marion L. Jetton* argued the cause for respondent. With her on the brief were *Solicitor General McCree, Assistant Attorney General Civiletti, Deputy Solicitor General Easterbrook,* and *John H. Burnes, Jr.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The question for decision is whether petitioner has made a sufficient showing in support of his claim to United States citizenship to entitle him to a *de novo* judicial determination

of that claim under § 106 (a)(5)(B) of the Immigration and Nationality Act, 8 U. S. C. § 1105a (a)(5)(B) (1976 ed.).

## I

In 1967, the Immigration and Naturalization Service began deportation proceedings against petitioner, Joseph Agosto, by issuance of a show-cause order charging that he was deportable as an alien who had unlawfully entered the United States. App. 4–6. Petitioner opposed deportation, claiming that he was born in this country and therefore is a citizen of the United States not subject to deportation. Over the course of several years, a series of hearings were held before an Immigration Judge,[1] at which the Service presented documentary evidence in an effort to show that petitioner was born in Italy in 1927 of unknown parents, placed in a foundling home there, and ultimately adopted by an Italian couple. Petitioner presented testimony from himself and several other witnesses to show that he was born in Ohio of an Italian mother and sent to Italy at an early age to reside with the aforementioned couple.

In April 1973, the Immigration Judge issued the deportation

---

[1] After petitioner's first set of hearings, an Immigration Judge issued a deportation order, App. 18, which petitioner then appealed to the Board of Immigration Appeals. The Board remanded to permit the Immigration Judge to consider petitioner's claim that he was entitled to relief from deportation pursuant to § 241 (f), 8 U. S. C. § 1251 (f) (1976 ed.), as the husband of a United States citizen, but did not consider petitioner's other challenges to the finding that he was deportable. App. 19–20. At the hearing on remand, the Service lodged an additional charge against petitioner alleging that he was deportable because he had been convicted of crimes of moral turpitude. The Immigration Judge adhered to his finding that petitioner was deportable and not entitled to relief under § 241 (f). Record 677–691. On petitioner's second appeal, the Board again remanded for a further determination of petitioner's eligibility for § 241 (f) relief and to permit petitioner to produce certain witnesses in support of his claim to United States citizenship. Record 628–633. The deportation order challenged here was issued after petitioner's third set of hearings, App. 23–59, and the Board affirmed the order. Pet. for Cert. iv–xiii.

order challenged here, rejecting the evidence tendered by petitioner and his witnesses that he was born in the United States. App. 23–59. The Board of Immigration Appeals affirmed. It noted that, "[i]f believed, the testimony of [petitioner's witnesses] clearly refutes the Service's otherwise strong documentary demonstration of [petitioner's] alienage" and that "[i]t is not beyond the realm of possibility that [petitioner's] claim to United States citizenship is legitimate." Pet. for Cert. viii. The Board nevertheless accepted the Immigration Judge's credibility determinations and found that the "Service's case as to alienage is clear, convincing and unequivocal." *Id.*, at xi.

Agosto petitioned for review of the Board's decision in the United States Court of Appeals for the Ninth Circuit pursuant to § 106 of the Act, and claimed that, pursuant to § 106 (a)(5), he was entitled to a *de novo* hearing in District Court to determine whether he was a United States citizen. Section 106 (a)(5) provides that, whenever a petitioner "claims to be a national of the United States and makes a showing that his claim is not frivolous," the court of appeals is to transfer the proceedings to the district court for a hearing on that claim if "a genuine issue of material fact as to the petitioner's nationality is presented." When no genuine issue of material fact is presented, the court of appeals has authority to "pass upon the issues presented." [2]

---

[2] Section 106 (a)(5), as set forth in 8 U. S. C. § 1105a (a)(5) (1976 ed.), provides:

"[W]henever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in

The Court of Appeals, with one judge dissenting, refused to transfer the case to the District Court for a *de novo* hearing on petitioner's citizenship claim, and affirmed the deportation order. Pet. for Cert. i; affirmance order, 549 F. 2d 806. It held that "[t]he evidence presented to the immigration judge does not disclose a colorable claim to United States nationality." Pet. for Cert. ii. Further, the Court of Appeals apparently concluded that in order to obtain a *de novo* hearing petitioner was required to present "substantial evidence" in support of his citizenship claim and that he had failed to do so. *Ibid.* The dissenting judge, while acknowledging that as a factfinder she would not have credited petitioner's testimony, stated that "I do not believe our legally assigned role includes a decision on credibility, and, on that basis, I am unable to say that petitioner's evidence, if believed, would not present a colorable claim to American citizenship." *Ibid.*

We granted certiorari, 434 U. S. 901 (1977), to consider the proper construction of § 106 (a)(5)(B), and we now reverse.

## II

In 1961, Congress enacted § 106 of the Immigration and Nationality Act, 8 U. S. C. § 1105a (1976 ed.), in order "to create a single, separate, statutory form of judicial review of administrative orders for the deportation . . . of aliens from the United States." H. R. Rep. No. 1086, 87th Cong., 1st Sess., 22 (1961).[3] This statutory provision eliminated district court

the district court under the provisions of section 2201 of title 28. Any such petitioner shall not be entitled to have such issue determined under section 1503 (a) of this title or otherwise . . . ."

[3] Prior to 1961, there was no specific statutory authorization for judicial review of deportation orders. For many years, habeas corpus had been the exclusive judicial remedy for challenging such orders, see *Heikkila* v. *Barber,* 345 U. S. 229, 235 (1953), but in 1955, we held that aliens could also obtain review of deportation orders in actions for declaratory and injunctive relief in district court under § 10 of the Administrative Procedure Act, 5 U. S. C. § 702 (1976 ed.), *Shaughnessy* v. *Pedreiro,* 349 U. S. 48.

review of deportation orders under § 10 of the Administrative Procedure Act, 5 U. S. C. § 702 (1976 ed.), and replaced it with direct review in the courts of appeals based on the administrative record. Congress carved out one class of cases, however, where *de novo* review in district court would be available: cases in which the person subject to deportation claims to be a United States citizen.

In carving out this class of cases, Congress was aware of our past decisions holding that the Constitution requires that there be some provision for *de novo* judicial determination of claims to American citizenship in deportation proceedings. See H. R. Rep. No. 1086, *supra,* at 29; H. R. Rep. No. 565, 87th Cong., 1st Sess., 15 (1961). In *Ng Fung Ho* v. *White,* 259 U. S. 276, 284 (1922), the Court observed:

> "Jurisdiction in the executive to order deportation exists only if the person arrested is an alien. . . . To deport one who . . . claims to be a citizen, obviously deprives him of liberty, . . . [and] may result also in loss of both property and life; or of all that makes life worth living."

We therefore held that a resident of this country has a right to *de novo* judicial determination of a claim to United States citizenship which is supported "by evidence sufficient, if believed, to entitle [him] to a finding of citizenship." *Id.,* at 282. See also *United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149, 152–153 (1923). In *Kessler* v. *Strecker,* 307 U. S. 22, 34–35 (1939), we reaffirmed that holding and indicated in dictum that judicial determination of citizenship claims is required where "substantial evidence" is presented to support the citizenship claim.

In the instant case, the court below stated that petitioner failed to satisfy the standard of *Kessler* v. *Strecker, supra;* the court thus implicitly held that the standard of "substantial evidence" had been incorporated into § 106 (a)(5)(B). Pet. for Cert. ii. We disagree. Although Congress intended § 106

(a)(5) to satisfy any constitutional requirements relating to *de novo* judicial determination of citizenship claims, *supra,* the statute clearly does not restrict *de novo* review to cases in which the "substantial evidence" test is met. Rather than incorporating the specific language of *Kessler* into the statute, as it easily could have done, Congress chose instead to require hearings where there is "a genuine issue of material fact"—a standard that is different from but as familiar as the substantial-evidence standard.[4]

This statutory language is virtually identical to that embodied in Fed. Rule Civ. Proc. 56, which governs summary judgment motions. Under Rule 56, district court litigants opposing summary judgment have a right to a trial whenever there exists a "genuine issue as to any material fact." We may reasonably assume that, in using the language from Rule 56 as the standard for granting *de novo* district court hearings on citizenship claims, Congress intended the language to be interpreted similarly to that in Rule 56. " '[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.' " *Lorillard* v. *Pons,* 434 U. S. 575, 583 (1978), quoting *Standard Oil* v. *United States,* 221 U. S. 1, 59 (1911). The Court of Appeals decision in this case, to the extent that it holds *de novo* review to be required only where the petitioner presents substantial evidence in support of his

---

[4] In addition to showing the existence of a "genuine issue of material fact" as to his nationality, a petitioner must demonstrate that his citizenship claim is not "frivolous" to obtain a *de novo* hearing. § 106 (a) (5). The "frivolousness" standard apparently refers to the merits of the legal theory underlying the citizenship claim. A "frivolous" claim would be analogous to one that could not survive a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. Rule Civ. Proc. 12 (b) (6). No one has suggested that the legal theory underlying petitioner's claim to American citizenship—that he was born in this country—is frivolous.

claim to citizenship,[5] is thus contrary to the plain language and clear meaning of the statute.[6]

Nor does anything in the legislative history indicate that Congress intended to require *de novo* judicial determination of citizenship claims only when such determinations would be compelled by the *Kessler* "substantial evidence" standard. Although there are references in the legislative history suggesting that a claim to citizenship must itself be "substantial," these statements are not amenable to the interpretation that substantial evidence is required in support of the claim before a judicial hearing would be provided. See, *e. g.*, H. R. Rep. No. 1086, *supra,* at 29; H. R. Rep. No. 565, *supra,* at 5. While Congress in enacting § 106 sought to "expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts," *Foti* v. *INS,* 375 U. S. 217, 226 (1963), this concern hardly justifies the assumption that Congress intended to impose a steep hurdle to judicial determination of citizenship claims. None of the abuses of judicial

---

[5] In addition to holding that petitioner had not satisfied the standard of *Kessler* v. *Strecker,* the Court of Appeals held that petitioner had not made a "colorable" claim to United States citizenship. The dissenting judge stated that she was unable to say that petitioner's claim was not "colorable." The term "colorable" appears nowhere in the statute, and neither opinion hints at its derivation. We cannot tell whether, by use of the word "colorable," the Court of Appeals was applying the proper standard as set forth in § 106 (a)(5); if it was applying that standard, we believe it did so erroneously. See Part III, *infra.*

[6] None of the other Courts of Appeals to apply the standard have held that "substantial evidence" is necessary to trigger *de novo* review under § 106 (a)(5)(B). Instead, they have all indicated, although with some variation in language, that the appropriate standard is whether there is a genuine issue of material fact as to petitioner's alienage. See *Olvera* v. *Immigration & Naturalization Service,* 504 F. 2d 1372, 1375 (CA5 1974); *Rassano* v. *Immigration & Naturalization Service,* 377 F. 2d 971, 972 (CA7 1966); *Maroon* v. *Immigration & Naturalization Service,* 364 F. 2d 982, 989 (CA8 1966); *Pignatello* v. *Attorney General of the United States,* 350 F. 2d 719, 723 (CA2 1965).

review catalogued by Congress in the Committee Reports related to citizenship claims. See H. R. Rep. No. 565, *supra*, at 7–13. Rather, Congress was primarily concerned with the filing of repetitive petitions for review and with frivolous claims of impropriety in the deportation proceedings.[7] See, *e. g.*, H. R. Rep. No. 1086, *supra*, at 23, 33; 107 Cong. Rec. 19650 (1961) (remarks of Sen. Eastland); 105 Cong. Rec. 12724 (1959) (remarks of Rep. Walter).

Since summary judgment principles are controlling here, it follows that a court of appeals cannot refuse to allow a *de novo* review of a citizenship claim if the evidence presented in support of the claim would be sufficient to entitle a litigant to trial were such evidence presented in opposition to a motion for summary judgment. More specifically, just as a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented, see *Poller* v. *Columbia Broadcasting System, Inc.*, 368 U. S. 464, 467–468 (1962); 6 J. Moore, Federal Practice ¶ 56.02 [10], p. 56–45 (2d ed. 1976), so too a court of appeals is not at liberty to deny an individual a *de novo* hearing on his claim of citizenship because of the court's assessment of the credibility of the evidence, see *Pignatello* v. *Attorney General of the United*

---

[7] Section 106 was designed to minimize dilatory and repetitious litigation of deportation orders in several key respects. First, § 106 (c) precludes consideration of petitions for review or for habeas corpus where the validity of the deportation order "has been previously determined in any civil or criminal proceeding, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order." 8 U. S. C. § 1105a (c) (1976 ed.). Second, § 106 (a)(1) mandates that all petitions for review must be filed within six months of the date of the final deportation order. 8 U. S. C. § 1105a (a)(1) (1976 ed.). Finally, the statutory review proceeding replaces review in the district court under § 10 of the Administrative Procedure Act, 5 U. S. C. § 702 (1976 ed.), with review directly in the courts of appeals. 8 U. S. C. § 1105a (a) (1976 ed.). See *supra*, at 752–753.

*States,* 350 F. 2d 719, 723 (CA2 1965). Particularly where the evidence consists of the testimony of live witnesses concerning material factual issues, it will seldom if ever be appropriate to deny a *de novo* hearing, since "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Poller* v. *Columbia Broadcasting System, Inc., supra,* at 473.

### III

Applying the appropriate standard to the record in this case, it is apparent that the Court of Appeals erred when it failed to transfer the case to the District Court for a *de novo* hearing. The Service's proof that petitioner is not a United States citizen would certainly be sufficient, if uncontradicted, to establish his birth in Agrigento, Italy, in July 1927. However, the evidence adduced by petitioner to support his claim of American citizenship creates "genuine issue[s] of material fact" that can only be resolved in a *de novo* hearing in the District Court.

Petitioner acknowledges that the Service's documentary proof pertains to him. This proof includes an entry from the city of Agrigento registry of births for 1927 relating that a 75-year-old handywoman appeared before the registrar and declared that "at 4:00 a. m. on the 17th day of [July] in a house situated in Via Oblati, of a woman who does not want to be named, a male child was born, which she presents to me and to whom she gives the first name of Vincenzo and the surname of Di Paola." Record 667. The city registry also indicates that the child was sent to a foundling home. In addition, the foundling home's registry indicates that a Vincenzo Di Paola was born on July 16, 1927, and was consigned to Crocifissa Porello, petitioner's adoptive mother and wife of Pietro Pianetti, petitioner's adoptive father, on August 26, 1927. The last piece of documentary evidence is a translation from the foundling home record showing that Vincenzo Di Paola was baptized on July 18, 1927.

Petitioner claims, however, that the records regarding Vincenzo Di Paola were made at the request of his maternal grandfather to hide the true facts of his illegitimate birth in the United States. Petitioner's evidence in support of his claim to United States citizenship consisted of his own testimony and that of his adoptive parents, Crocifissa and Pietro Pianetti, and his alleged half brother, Carmen Ripolino.

According to the testimony of the Pianettis, petitioner was the illegitimate son of Crocifissa Pianetti's sister, Angela Porello, who left her Italian husband and two daughters in 1921 to move to the United States with her cousin Giacomo Ripolino. Through correspondence with Angela, the Pianettis learned in about 1925 that petitioner had been born, that his father was Salvatore Agosto, and that Angela had at least two other children, including Carmen Ripolino. According to the Pianettis, petitioner was sent to live with them and with Angela's parents because Angela could not care for petitioner in Ohio. The Pianettis testified that petitioner was never in the foundling home, but that the documents presented by the Service concerning petitioner's birth in Italy were created by Angela's father to hide the fact that petitioner was his illegitimate grandson.[8]

Carmen Ripolino corroborated the testimony of the Pianettis in important respects. He testified that his mother was Angela Porello, and that she told him when he was a child that he had two half sisters in Italy and a half brother whom she had sent there to live with her mother. Although Carmen Ripolino admitted having no independent knowledge that petitioner was the brother who had been sent to Italy, his testimony corroborated that of the Pianettis that Angela Porello gave birth to a son in this country whom she sent to Italy to live with relatives.

Petitioner's testimony was only partially consistent with

---

[8] Petitioner and the Pianettis testified that the name Vincenzo Di Paola was probably chosen because July 17 was the feast day for Saint Vincent.

that of his witnesses. Because he possessed a birth certificate belonging to one Joseph Agosto, born in Cleveland in 1921, which had allegedly been sent to petitioner in Italy by another American relative between 1948 and 1950, petitioner maintained for a time that he was that Joseph Agosto, the son of Salvatore Agosto and his wife Carmela Todaro.[9] The birth certificate had not actually been issued, however, until sometime after petitioner claimed to have received it. At the same time petitioner also testified that he had been told that his mother's name was Angela Porello and that he lived with his grandfather and the Pianettis after coming to Italy as a small boy. Petitioner acknowledged that he had been known by different names at different times.

There is no doubt that petitioner has not told one story consistently throughout his deportation hearings and has attempted to establish his citizenship by relying on any possible shred of evidence. Nor is there any doubt that petitioner has told different stories about his past to different courts.[10] But it is noteworthy that, starting in his first deportation hearing, petitioner has acknowledged that he is not certain of his true parental origins, and that he had been told that his mother was Angela Porello. And, given the obvious confusion and uncertainty surrounding the circumstances of petitioner's birth (under either the Service's theory or that of petitioner),

---

[9] Salvatore Agosto was sometimes referred to in the deportation proceedings as Arcangelo Agosto. Petitioner claimed they were different names for the same man who used one name with his wife, Carmela Todaro, and one name with Angela Porello.

[10] Petitioner maintained, in connection with a suit to declare his third wife his lawful wife, that he had been only 17 at the time of an earlier marriage in 1944, though in the deportation proceedings he claimed to have been born no later than 1925. In an effort to obtain leniency at his sentencing for falsification of papers in connection with a Federal Housing Administration loan, petitioner permitted his attorney to represent to the court that petitioner had no prior convictions, even though he did at that time have a criminal record in Italy.

it is hardly surprising that petitioner cannot say with any degree of certainty who his true parents might have been.

We need not decide whether petitioner's testimony, standing alone, is so inherently incredible in light of its internal inconsistencies as to justify denial of *de novo* judicial review of the citizenship claim. In this case, the citizenship claim is supported by the testimony of three witnesses whose story, while highly unusual, certainly cannot be rejected as a matter of law. Their disputed testimony concerning petitioner's birth in this country and subsequent upbringing in Italy is in most respects no more unusual than their unchallenged testimony concerning other aspects of this family's relations.[11] To accept the present claim to United States citizenship, the District Court would need only to believe that petitioner was born to Angela Porello in Ohio in the mid-1920's; that he was sent by her to live with the Pianettis in Italy; and that Angela's father had the birth records in his native town falsified to prevent public knowledge of the birth of an illegitimate child to his daughter while still permitting him and other members of his family to raise the child.[12] These events, while out of

---

[11] For example, Carmen Ripolino testified that he did not know who his father was, and that he had two birth certificates, one showing his father as Giacomo Ripolino (the man who brought Angela Porello to this country) and a second showing his father to be one Charles Litizia. In addition, the Pianettis testified to the varied relationships Mrs. Pianetti's sister, Angela Porello, maintained with different men and to her departure from Italy with one of those men, leaving behind a husband and two daughters. Although the Service may not have challenged this other testimony because it was immaterial to the issue of petitioner's citizenship, its lack of materiality and its unflattering character also suggest that the witnesses would have had no reason to testify to those events if they had not occurred.

[12] Since only the registrar signed the entry in the registry of births regarding the birth of Vincenzo Di Paola and the witnesses who were present were unable to write and only had the document read to them, it is certainly not entirely implausible that Angela's father was able to have that record and the notation at the foundling home falsified.

the ordinary, are not so extraordinary as to compel disbelief in their occurrence. Even the Board of Immigration Appeals, which rejected petitioner's claim of citizenship, stated that "[i]t is not beyond the realm of possibility that [petitioner's] claim to United States citizenship is legitimate." Pet. for Cert. viii.

Since the documentary evidence submitted by the Service would be refuted by the testimony of petitioner's witnesses if that testimony were accepted by the trier of fact, *ibid.*, there is plainly a genuine issue of material fact for the District Court on the question of petitioner's citizenship. Although as the trier of fact the District Court might reject the testimony of these witnesses because of their interest in the outcome, that determination has been committed by Congress to the district courts by § 106 (a)(5)(B) of the Act and not to the courts of appeals. The decision of the Court of Appeals must therefore be reversed and the case remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE POWELL, with whom MR. JUSTICE REHNQUIST joins, dissenting.

The Court today has construed a statute in a way that rewards falsehood and frustrates justice. The statute is § 106 (a) of the Immigration and Naturalization Act, 8 U. S. C. § 1105a (a) (1976 ed.), adopted in 1961 as part of a general revision of the statutory provisions governing judicial review of deportation orders. The general revision was designed to prevent repetitious litigation of frivolous claims, and "dilatory tactics" used to forestall deportation, by eliminating in most instances any review by district courts of deportation decisions. *Foti* v. *INS,* 375 U. S. 217, 224–225 (1963).[1]

---

[1] "[B]y eliminating review in the district courts, the bill [was intended to] obviate one of the primary causes of delay in the final determination of all questions which may arise in a deportation proceeding." 104 Cong.

The general rule under § 106 (a) leaves deportation matters largely to administrative proceedings, subject to review by a court of appeals to ensure that the administrative decision is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U. S. C. § 1105 (a) (4) (1976 ed.). Section 106 (a) (5), quoted *ante,* at 751–752, n. 2, provides a narrow exception to the general rule when the deportation proceeding involves a person claiming to be a national of the United States. In such a proceeding, § 106 (a) (5) requires a reviewing court of appeals to refer the case to a district court for a *de novo* trial when the claimant clears two hurdles: first he must show that his claim to United States citizenship is not "frivolous," and then that its resolution turns on "a genuine issue of material fact." As indicated in the Court's opinion, the statute is hardly a model of artful draftsmanship. Even so, it is unnecessary to construe it, as the Court does, to require a trial *de novo* in federal district court in response to any asserted claim to citizenship turning on questions of "credibility," however farfetched.

There can be no case less deserving of further factual review than this one. Petitioner is an ex-convict, convicted of several crimes involving moral turpitude. He has told five different stories with respect to his nationality, inventing new fabrications to meet the Service's evidence or whenever they served other purposes. See *ante,* at 759 n. 10. No one has believed his stories. Yet he has proved himself a master at exploiting the safeguards designed to vindicate bona fide— not specious—claims of citizenship. The Court's holding totally frustrates the intent of Congress in enacting § 106 (a), in response to the "growing frequency of judicial actions being instituted by undesirable aliens whose cases have no legal basis or merit, but which are brought solely for the purpose of preventing or delaying indefinitely their deportation

Rec. 17173 (1958) (remarks of Rep. Walter), quoted in *Foti* v. *INS,* 375 U. S., at 225 n. 11.

from this country." H. R. Rep. No. 1086, 87th Cong., 1st Sess., 22–23 (1961). Rather than putting an end to this abuse of our generous procedures, the Court now concludes that petitioner is entitled to a *de novo* trial of a claim to citizenship so transparently false that none of the numerous judges who have passed on it believes it.

I

The Immigration Service claims that petitioner is an Italian by birth named Vincenzo Di Paola Pianetti, and that he is deportable because his most recent entry into the United States was fraudulent and because he has been convicted of crimes involving moral turpitude. The Service claims that petitioner last entered the United States in 1966, purporting to be a citizen of the United States and relying on the passport of Joseph Agosto. Petitioner claims he was born in Cleveland, Ohio, assigning various dates of birth from 1921 to 1927, and was named Joseph Agosto; that he was sent to Italy when he was 2 or 3 years old; that he lived there with his natural mother's sister and her husband, who later "affiliated" him and gave him their name; and that he returned to the United States in 1951 or 1952. The issue ultimately is one of identity. If petitioner is "Agosto" rather than "Pianetti," he is an American citizen. During the course of the instant proceedings, commenced in 1967, not a single administrative or judicial official has believed that petitioner is not the Italian-born Pianetti.

The proceedings in this case have been protracted. On September 5, 1967, the Service issued a show-cause order, and notice of hearing, seeking petitioner's deportation. A full hearing was held before an Immigration Judge. The Service introduced documentary evidence demonstrating that petitioner was born, taken to a foundling home, and baptized in Agrigento, Italy, in 1927, and later was entrusted to the Pianettis. See *ante,* at 757. The Service also demonstrated

that petitioner was married to an Italian woman in 1944 and had two daughters in Italy. At this first hearing, petitioner conceded that the documentary evidence pertained to him, but claimed that he really had been born in Cleveland, Ohio, in 1921, and was named Joseph Agosto. Petitioner produced a marriage certificate showing that he was married in Alaska in 1953, and that he claimed at the time to be 32 years old and not previously married. Petitioner testified that he was sent to Italy when he was 4 or 5, and that his belief that he was born in Cleveland was based entirely on the birth certificate which an uncle sent him from the United States. The Service countered with documentary evidence that the birth certificate pertained to a Joseph Agosto who had been born in Cleveland in 1921 and died in Italy in 1951, and an affidavit from Joseph Agosto's sister that petitioner falsely was using the identity of her deceased brother.

The Immigration Judge sustained the charge of the Service and entered a deportation order. He concluded that petitioner "presented no credible evidence to show that he is not the person [Pianetti] whom the Government claims him to be." App. 14. On appeal, the Board of Immigration Appeals remanded the proceedings, "without reviewing the case on the merits," for the Immigration Judge to consider petitioner's contention that he was nondeportable under § 241 (f) of the Act, 8 U. S. C. § 1251 (f) (1976 ed.), because of his marriage to an American citizen, Mary Marie Agosto.[2]

Following a second hearing, the Immigration Judge again found petitioner not a citizen, deportable (not only because he had entered the United States without inspection but also

---

[2] On June 3, 1968, in connection with a friendly suit to have Mary Marie Agosto declared his legal wife, petitioner executed an affidavit which contradicted the story told at the first deportation hearing. The affidavit stated that petitioner was born in 1927, and therefore was only 17 when he married his Italian wife in 1944. This would have rendered his first marriage invalid and would have validated his American marriage.

because he had been convicted of several crimes involving moral turpitude), and not entitled to relief under § 241 (f). Again petitioner appealed to the Board of Immigration Appeals. On this appeal petitioner conceded that a Joseph Agosto died in Italy in 1951, but maintained that there were "two Joseph Agostos," both born in Cleveland of the same father but different mothers. Petitioner explained the fact of only one birth certificate by saying that his mother had been the father's mistress and that the birth of the legitimate Joseph Agosto had not been recorded. The Board again declined to reach the merits of petitioner's claim to citizenship and remanded for consideration of "forgiveness" relief under § 241 (f).

It was not until the third hearing in 1971 that petitioner produced three witnesses, the couple who adopted him in Italy and his supposed half-brother from Ohio, who testified in support of petitioner's claim to citizenship. Petitioner abandoned his other stories of birth in 1921 or 1927, and maintained that he was born in Cleveland in 1924, the son of the father of the Joseph Agosto who was born in 1921. On April 11, 1973, the Immigration Judge filed an exhaustive opinion concluding that all of petitioner's various and contradictory stories were fabrications. App. 23–59. The opinion characterized petitioner as having had, since "he was sixteen years of age, . . . a record of deceit, double-dealing and subterfuge." *Id.*, at 32. The Board of Immigration Appeals affirmed. In the context of affirming the denial of discretionary relief from deportation, it observed that petitioner "knowingly gave false testimony before the immigration judge; his claim to citizenship has been knowingly false since its inception." Pet. for Cert. xii.

Having finally exhausted his administrative remedies, petitioner appealed to the United States Court of Appeals for the Ninth Circuit. That court issued its memorandum decision on January 24, 1977, and sustained the deportation decision, say-

ing: "The evidence presented to the immigration judge does not disclose a colorable claim to United States nationality; nor does it meet the standard set forth in *Kessler* v. *Strecker,* 307 U. S. 22, 35 (1939)." *Id.,* at ii.

We granted certiorari on October 17, 1977. 434 U. S. 901. Today the Court hands down a decision entitling petitioner to continue his 11-year saga, commencing with a trial *de novo* in a district court.

## II

The first flaw in the Court's reasoning is that it reads out of the statute the threshold requirement that the claim to United States nationality not be "frivolous." The Court muses in a footnote, without support, that "[t]he 'frivolousness' standard apparently refers to the merits of the legal theory underlying the citizenship claim," *ante,* at 754 n. 4, and therefore has been satisfied in this case because petitioner's theory of citizenship—that he was born in this country—is not frivolous.

Neither the language of the statute nor its legislative history sheds any helpful light on the intended meaning of the term "frivolous" for purposes of this statute.[3] The term may well refer in some instances to the underlying legal theory of a claim. But to say that this is the exclusive meaning is virtually to read the term out of the statute. If all that is required for a claim to be considered nonfrivolous is that the alleged alien maintain that he was born in this country, patently frivolous claims will pass the first threshold of the statute.[4] If Congress thought that every claim to birth

---

[3] The origin of the term in this context seems to have been *Ng Fung Ho* v. *White,* 259 U. S. 276 (1922), where the Court articulated the constitutional requirement of a judicial hearing when the petitioner "claims citizenship and makes a showing that his claim is not frivolous . . . ." *Id.,* at 284. The threshold requirement that the claim not be frivolous was absent from one of the earlier drafts of § 106 (a) (5). See H. R. Rep. No. 2478, 85th Cong., 2d Sess., 1 (1958).

[4] Petitioner himself does not argue that a "frivolous" claim to citizenship can only be one whose underlying legal theory is frivolous. Petitioner's

in this country, however tenuous, merited judicial *trial* rather than judicial *review,* one would assume it would have so provided rather than create a dual system of *de novo* fact-finding by both administrative and judicial proceedings. In addition, the legal theory underlying *any* claim to citizenship almost always will be that the purported citizen was born or naturalized in the United States. According to the Court's theory, therefore, the underlying legal theory of a claim to citizenship rarely will be deemed "frivolous."

We normally construe statutes to give meaning to each of their components. I read Congress' intent to have been that the courts of appeals must examine the administrative record to determine whether a claim to citizenship is frivolous for any reason.[5] And it would be difficult to find a more frivolous claim to citizenship than this one.[6]

## III

Assuming, *arguendo,* that petitioner's claim is not frivolous, the Court of Appeals was required to transfer the case to a

---

counsel conceded before us that if there were uncontested documentary evidence of birth in Italy and only the alien's sworn statement that he was born in the United States, "that would be a frivolous claim because [the hypothetical case] is really a bare assertion of citizenship without any evidentiary support at all." Tr. of Oral Arg. 10.

[5] The courts of appeals are accustomed to determining whether *in forma pauperis* appeals from denials of habeas corpus petitions are "frivolous," and therefore warrant dismissal, under 28 U. S. C. § 1915 (d). Whether such an appeal is considered "frivolous" may depend on either the legal theory or the facts of the case.

[6] In *Maroon* v. *Immigration & Naturalization Service,* 364 F. 2d 982 (CA8 1966), the alleged alien—somewhat like petitioner here—changed his story between the deportation proceedings and judicial review, in the face of solid contrary documentation offered by the Service. The Court of Appeals concluded: "In this situation, petitioner's present claim to be a national of the United States, wholly unsupported by any substantial evidence whatever, and utterly inconsistent with the documents admittedly executed by him, would appear to be *frivolous." Id.,* at 989 (emphasis supplied).

district court for a *de novo* hearing only if it concluded that a "genuine issue of material fact" existed. The Court today, applying the standard governing summary judgment in the federal courts, concludes that a genuine issue of material fact exists here because "the citizenship claim is supported by the testimony of three witnesses whose story, while highly unusual, certainly cannot be rejected as a matter of law." *Ante,* at 760. The fallacy in this holding is twofold. First, it applies an erroneous standard. The Court assumes that Congress meant to import the summary judgment standard into an entirely different statutory scheme, simply because the same words appear in both contexts. While this is a superficially appealing approach, it abdicates our responsibility to construe the statute in light of its origin and purpose. The second flaw in the Court's holding lies in its incorrect application of the summary judgment standard itself.

## A

Section 106 (a)(5) apparently was enacted in order to satisfy the constitutional requirement, first enunciated in *Ng Fung Ho* v. *White,* 259 U. S. 276 (1922), that a resident who claims to be a United States citizen and supports the claim with the requisite quantum of proof is entitled to a judicial determination of his claim to citizenship. *Id.,* at 282–285; see H. R. Rep. No. 1086, 87th Cong., 1st Sess., 29 (1961). The Court held that two of the petitioners in *Ng Fung Ho* were entitled to a *de novo* judicial determination of their citizenship claim because they "supported the claim by evidence sufficient, if believed, to entitle them to a finding of citizenship." [7] 259 U. S., at 282.

---

[7] In *Ng Fung Ho,* two of the petitioners' claims of citizenship apparently were not contradicted by independent evidence presented by the Government. Rather, the petitioners had entered the United States lawfully, as the foreign-born sons of a naturalized United States citizen and therefore as citizens themselves, and had been issued "certificates of identity." Later, when immigration officials came to suspect perjury in the earlier

The standard of proof required by *Ng Fung Ho* for a judicial hearing was restated in two later cases, both decided before the enactment of § 106 (a)(5). In *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S. 149 (1923)—which, like *Ng Fung Ho*, was written by Mr. Justice Brandeis—no claim to citizenship had been made. The Court observed, however, that "[i]f, in the deportation proceedings, Bilokumsky had claimed that he was a citizen *and had supported the claim by substantial evidence*, he would have been entitled to have his status finally determined by a judicial, as distinguished from an executive, tribunal." 263 U. S., at 152 (citing *Ng Fung Ho, supra*) (emphasis supplied). In *Kessler* v. *Strecker*, 307 U. S. 22, 34–35 (1939), the Court again observed, citing *Bilokumsky,* that an alien is entitled to a trial *de novo* on a claim of citizenship if supported by "substantial evidence." It is clear, therefore, that the constitutional requirement of a *de novo* judicial hearing is triggered only if the person claiming citizenship provides some substantial evidentiary support for his claim.

The Court's conclusion that Congress intended to set a lower standard in § 106 (a)(5) is not supported by the legislative history. The Court acknowledges but disregards the fact that the House Reports antedating enactment of § 106 (a)(5) contain repeated references to "substantial" and "genuine" claims to citizenship. See *ante,* at 755; see also H. R. Rep. No. 1086, *supra,* at 28; H. R. Rep. No. 565, 87th Cong.,

---

proceedings, they sought to deport the petitioners. The petitioners argued in this Court that the immigration authorities had not presented any "real substantial evidence to support them in attempting . . . to set aside the former finding of American citizenship. . . ." Brief for Petitioners in *Ng Fung Ho* v. *White,* O. T. 1921, No. 176, p. 33. Thus the determination of citizenship in *Ng Fung Ho* depended entirely on whether the evidence of the petitioners was believed by the factfinder or disbelieved because of the Service's attempt to discredit it. Perhaps this explains the Court's use of the "sufficient, if believed" language.

1st Sess., 13, 15 (1961). In each of these Reports the reference to "a substantial claim of U. S. nationality" immediately precedes the observation that the statute was meant to satisfy the constitutional requirement articulated in *Ng Fung Ho.*

In the face of this unequivocal evidence of legislative intent, the Court errs in concluding that Congress meant to depart from the evidentiary standard stated in *Ng Fung Ho,* as interpreted in *Bilokumsky* and *Kessler.* The Court then compounds its error by holding that § 106 (a)(5) places a court of appeals, in reviewing a decision of the Board of Immigration Appeals, in the position of a district court ruling upon a motion for summary judgment at the outset of a trial. Fed. Rule Civ. Proc. 56 (c). Although there is congruity in the "genuine issue of material fact" language, found in both § 106 (a)(5) and Rule 56 (c), there is a controlling difference in the settings in which this language is used.

In the usual civil trial, the summary judgment motion is entertained before any hearing has taken place. If sustained, it forecloses all opportunity for the opposing party to present his case before the finder of fact. Subject to appeal, a decision in favor of the movant in effect deprives his opponent of a trial on the facts. The situation to which § 106 (a)(5) applies simply is not comparable. That section is part of an elaborate administrative procedure in which a claimant may present fully his evidence to an Immigration Judge and then have it reviewed by the Board of Immigration Appeals. There is no summary judgment procedure under the Act and, consequently, no danger that a claimant will be denied a full evidentiary hearing. In this respect, the standard contained in § 106 (a)(5) is more like the standard governing directed verdicts, Fed. Rule Civ. Proc. 50, than summary judgments.[8]

---

[8] When a party moves for a directed verdict, he does so after the evidence is in. This is comparable to the situation confronting a court of appeals in a case like this. The formulation of the standard governing summary judgments and directed verdicts is the same with respect to

Although the Court of Appeals in this case itself did not observe the witnesses who testified on petitioner's behalf, it was not required to ignore completely the unequivocal opinion of the Immigration Judge that petitioner's witnesses had been "coached as to their testimony," Pet. for Cert. viii; see App. 41, and that their stories were fabrications. Even if the Court of Appeals was not in as good a position to judge these matters as a judge ruling on a motion for directed verdict, neither was it as constricted as a judge ruling on a motion for summary judgment. As both motions are governed by the "genuine issue of material fact" standard, there is no reason to adopt the more restrictive but less appropriate analogy.[9]

This case illustrates forcefully the inappropriateness of the summary judgment analogy. Petitioner has had three evidentiary hearings before an Immigration Judge, three appellate reviews by the Board of Immigration Appeals, and one review

the "genuine issue" rule: "Both motions . . . call upon the court to make basically the same determination—that there is no geninue issue of fact and that the moving party is entitled to prevail as a matter of law." 10 C. Wright & A. Miller, Federal Practice & Procedure § 2713, p. 407 (1973). Yet a major difference between summary judgment and directed verdict is that credibility determinations may enter into the latter but not the former. Unlike a summary judgment motion, "a directed verdict motion typically would be made after the witness had testified and the court could take account of the possibility that he either could not be disbelieved or believed by the jury." *Id.*, at 406.

[9] In addition, the Court substitutes its "genuine issue" standard for that used even by some of the Courts of Appeals in cases cited by the Court with approval. For example, in *Rassano* v. *Immigration & Naturalization Service*, 377 F. 2d 971 (CA7 1967), the petitioner and three supporting witnesses testified that the petitoner's father said he had been naturalized and that both father and son were citizens. They were unable to produce the naturalization papers or to testify that they had seen them. The court held that the evidence was insufficient to raise a genuine issue of material fact, in part because of the untrustworthiness of the testimony. While the *Rassano* court used the standard of "genuine issue of material fact," in conformity with the statutory language, it surely did not use the summary judgment standard endorsed by the Court today.

each by the Court of Appeals for the Ninth Circuit and the United States Supreme Court. One normally would expect that at the end of this elaborate sequence of hearings and reviews, the case would be concluded. Instead, the Court launches petitioner's litigation anew, bowing to a form of words rather than the substance of justice. All that has occurred—the entire sequence of *eight* proceedings—is merely prologue. Petitioner's case now starts afresh in a district court in the same way that any civil litigation would commence. He is free to change his testimony—again—and to round up new witnesses who will swear to it. If he loses once more, he will have an appeal as of right to the Court of Appeals; from there, he may file another petition for certiorari. This additional round of proceedings probably will take several years. Meanwhile, petitioner will continue to enjoy the privileges of American citizenship that he has consistently abused.

## B

Even if one assumes with the Court that the summary judgment analogy is appropriate, today's decision still is untenable. Under Rule 56 (c) itself, there must be a degree of substantiality to the evidence proffered in opposition to a summary judgment motion if the motion is to be defeated. See *Firemen's Mutual Ins. Co.* v. *Aponaug Mfg. Co.,* 149 F. 2d 359, 362 (CA5 1945); *Whitaker* v. *Coleman,* 115 F. 2d 305, 306 (CA5 1940); 10 C. Wright & A. Miller, Federal Practice & Procedure § 2725, p. 512 (1973); 6 J. Moore, Federal Practice ¶ 56.15 [4], p. 56–521 (2d ed. 1976). See also *Maroon* v. *Immigration & Naturalization Service,* 364 F. 2d 982, 989 (CA8 1966). A court never is required to accept evidence that is inherently incredible or " 'too incredible to be accepted by reasonable minds.' " [10] 6 Moore, *supra,* at 56–621.

---

[10] And while the facts must be viewed in the light most favorable to the party opposing summary judgment, this means no more than that

I believe petitioner's evidence reasonably cannot be viewed in any other light.[11]

In concluding that there is a "genuine issue of material fact" presented on this record, under the standard applicable to a summary judgment motion, the Court relies primarily on the testimony of petitioner's adoptive parents and supposed half brother, presented for the first time at petitioner's *third* hearing before the Immigration Judge. In effect, the Court applies the summary judgment standard as if the *only* testimony on the record were that adduced at the third hearing. But if the summary judgment standard is to be applied, it is necessary to view the evidence submitted by petitioner in its totality—as if petitioner, in contesting a summary judgment motion, had submitted three sets of depositions containing precisely the same evidence presented by him at the three administrative hearings. A district court then would be confronted with three significantly different stories, each sworn to by petitioner, one belatedly corroborated by his coached kinsmen, and all of them contradicted by authenticated documentary evidence. I doubt that any district court would find petitioner's evidence sufficient, viewed in its totality, to defeat a motion for summary judgment.

---

"the party opposing a summary judgment motion is to be given the benefit of all *reasonable* doubts and inferences in determining whether a genuine issue exists that justifies proceeding to trial." 10 Wright & Miller, *supra,* at 510 (emphasis supplied).

[11] The Board of Immigration Appeals did say: "It is not beyond the realm of possibility that [petitioner's] claim to United States citizenship is legitimate." Pet. for Cert. viii. But the rest of the Board's statements place this one in perspective. Immediately following its acknowledgment that petitioner's claim was not demonstrably impossible, the Board observed that it would have to accept a number of illogical and unrealistic propositions in order to accept petitioner's most recent story. In essence, the Board made clear that the story could not be accepted by reasonable minds; and it concluded ultimately that petitioner's claim to citizenship "[had] been knowingly false since its inception." *Id.,* at xii.

## IV

However one may read the unclear language of § 106 (a)(5), it is at least clear that Congress did not intend duplicate judicial proceedings to follow administrative proceedings simply upon demand. If ·all that § 106 (a)(5) requires is a swearing contest—even when the Government's case is predicated on documents whose authenticity is uncontested—then *every* subject of deportation proceedings has it within his power to circumvent the obvious intention of the statutory scheme to minimize dilatory tactics by deportable aliens. The Court today has opened wide this inviting door.