PROFESSIONAL SERVICES
SUPPLIER, INC.,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–460C.

United States Court of Federal Claims.

Jan. 21, 2000.

Roger C. Jones, Huddles & Jones, P.C., Columbia, Maryland, attorney of record for plaintiff.

Deborah P. Samuel, Washington, D.C., Department of Justice, Civil Division, with whom was Acting Assistant Attorney General David. W. Ogden, for defendant.

OPINION

ALLEGRA, Judge.

This contract suit is before the court on cross-motions for partial summary judgment. Plaintiff argues that the government's termination for default of the fixed price construction contract in question was improper because the contracting officer failed to provide a written cure notice to the plaintiff prior to the termination. Defendant counters that the Federal Acquisition Regulation (FAR) does not require a cure notice in the case of a fixed-price construction contract. Following consideration of the parties' submissions and oral argument on this issue, this court concludes that a written cure notice was not required in the instant case and, therefore, DENIES plaintiff's motion for partial summary judgment and GRANTS defendant's cross-motion.

I. Facts

On May 16, 1996, the defendant, through the Department of Interior's Fish and Wildlife Service, awarded a contract to Professional Services Supplier, Inc. (PSS), to build two large bird pens at the Patuxent Environmental Science Center in Laurel, Maryland. A Notice to Proceed was issued on June 17, 1996, with a scheduled completion date of October 16, 1996. Contract Modification No. 1 altered the completion date to November 27, 1996, due to inclement weather that hampered the construction.

Defendant alleges that PSS's performance of the contract consistently failed to meet the contract specifications. It alleges that the construction site was chronically understaffed; water lines and frame poles were improperly installed; and, most importantly, the wire mesh used to build the cages was cut too short, had holes bigger than contract specifications, and had numerous splices and

patches, which created barbs that threatened to harm the birds that would eventually inhabit the cages. Defendant contends that its on-site inspector, Mr. Bruce Williams, repeatedly conveyed to PSS agents at the construction site the defendant's lack of satisfaction with the work being performed.

On November 22, 1996, five days before the scheduled contract completion date, PSS received a written stop work directive from Ms. Ann Marie Beauregard, the contracting officer (CO) in charge of the construction contract. Also on November 22, 1996, the CO issued a show cause notice, advising PSS that the defendant was considering terminating the contract for default due to the poor nature of the mesh cutting and hanging. PSS responded to the CO's show cause notice by a letter sent on November 27, 1996. According to the defendant, this response failed to reassure the CO of PSS's ability to complete the project by the contract completion date. Both parties agree that no cure notice was ever issued to PSS. Moreover, the CO indicated in her deposition that she did not afford PSS an opportunity to correct the problems because she was convinced that the amount of work needing correction was too great and that PSS had proven too unreliable.

On December 3, 1996, government contract inspectors met with a representative of PSS, Mr. Lester Robinson, for a site inspection, after which, on December 12, 1996, the government terminated the contract for default pursuant to FAR § 52.249–10 ("Default (Fixed–Price Construction)"), incorporated by reference into the original contract. On July 7, 1997, plaintiff filed suit, seeking a conversion of the government's termination for default into a termination for convenience, and demanding $146,192 in damages due to allegations of unpaid work, performance bond surety damages, equitable adjustments due to alleged constructive changes, compensable delays, and legal fees and expenses.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *California ex rel. Dep't of Transp. v. United States*, 27 Fed.Cl. 130, 135 (1992), *aff'd*, 11 F.3d 1071, 1993 WL 410284 (Fed.Cir.1993).

When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. *See also Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *See Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### B. Analysis

Plaintiff argues that it should have been given an opportunity to cure and that the CO's failure to provide this option precluded her from terminating the contract for default.

Certain provisions of the FAR explicitly require a cure notice. Thus, for exam-

ple, in the case of fixed-price supply and service contracts, the FAR provides that "[t]he government's right to terminate this contract may be exercised if the Contractor does not cure such failure within 10 days ... after receipt of the notice from the Contracting Officer specifying the failure." 48 C.F.R. § 52.249–8(a)(2). *See also id.* at § 52.249–9(a)(2) (similar requirement for research and development contracts). However, no such cure requirement is contained in FAR section 52.249–10, which provides, in relevant part, that:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. § 52.249–10(a). Unlike the default provisions for supply and service contracts, this provision thus does not require that a contractor be afforded a period in which to cure defects before a contract is terminated for default. *See Appeals of ONI Construction, Inc.,* ASBCA Nos. 45,394, 46,087 & 46,303, 96–2 BCA ¶ 28,277; *Appeal of Twigg Corporation,* NASABCA No. 62–0192, 93–1 BCA ¶ 25,318; *Appeal of White Buffalo Construction, Inc.,* AGBCA No. 90–133–1, 93–3 BCA ¶ 26,236; *Appeal of Superior Communications Services, Inc.,* ASBCA No. 38,421, 89–3 BCA ¶ 22,236. *See also* Patrick J. Martell, *Failure to Make Progress,* in *Government Contract Default Termination* 4–1, 4–3 (Walter F. Pettit et al. eds.1991).

Plaintiff, however, argues that this regulation is inapplicable in the instant case because the contractor here allegedly did not "refuse[ ] or fail[ ] to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract." Plaintiff essentially argues that defects in workmanship, no matter how severe, are not covered by this language. This strained interpretation of the regulation, however, is untenable. Among other things, it is inconsistent with the plain language of the regulation that allows for termination where a contractor fails to perform "a portion of the work." The latter phrase must be deemed to include compliance with the contract's specifications and construction standards, particularly here, since the contract in question emphasized the importance of quality construction by including the FAR's clauses on workmanship, 48 C.F.R. § 52–236–5,[1] and warranty of construction, 48 C.F.R. § 52–246–21.[2] Moreover, construing section 52.249–10(a) not to cover defects in workmanship would leave the defendant with no express procedure to terminate a construction contract for such defects until such time as they prevented the contract from being timely completed. Given the comprehensive nature of the FAR, it would make no sense to leave such an obvious gap and, not surprisingly, it has instead uniformly been held that section 52.249–10(a) applies to workmanship defects.[3]

---

**1.** This clause provides, in pertinent portion, that "[a]ll work under this contract shall be performed in a skillful and workmanlike manner." 48 C.F.R. § 52.236–5(c).

**2.** This clause provides, in pertinent portion, that "[i]n addition to any other warranties in this contract, the Contractor warrants ... that work performed under this contract conforms to the contract requirements and is free of any defect in equipment, material, or design furnished, or workmanship performed by the Contractor or any subcontractor or supplier at any tier." 48 C.F.R. § 52.246–21(a).

**3.** *See, e.g., M.C. & D. Capital Corp. v. United States,* 948 F.2d 1251, 1256 (Fed.Cir.1991) (holding that the "government terminated the contract, ... not because MC & D had not completed the ... work, but because MC & D's work did not satisfy the contractual requirements," as deficiencies in contractor roofing installation violated the requirement that all work be performed "in a skillful and workmanlike manner," and thus default termination was proper); *CJP Contractors, Inc. v. United States,* 45 Fed.Cl. 343 (1999)(noting that defective workmanship is appropriate basis for default under § 52.249–10, as a "default termination may be sustained based on any valid grounds existing at the time of termination"); *Discount Co. v. United States,* 213 Ct.Cl. 567, 575, 554 F.2d 435 (1977)(holding that default termination does "not require a finding that completion within the contract's time limitations was impossible. Rather ... default termination was appropriate if a demonstrated lack of diligence indicated that the Government could not be assured of timely completion," as prior

■ Plaintiff next argues that if section 52.249–10 applies to this case, this court should imply or judicially incorporate a cure notice requirement therein based upon 48 C.F.R. § 49.402–3(d). That subsection provides that:

> (d) Subdivisions (a)(1)(ii) and (a)(1)(iii) of the Default clause cover situations when the contractor fails to perform some of the other provisions of the contract (such as not furnishing a required performance bond) or so fails to make progress as to endanger performance of the contract. If the termination is predicated upon this type of failure, the contracting officer shall give the contractor written notice specifying the failure and providing a period of 10 days (or longer period as necessary) ....  Upon expiration of the 10 days ... the contracting officer may issue a notice of termination for default unless it is determined that the failure to perform has been cured. A format for a cure notice is in 49.607.

Though other subsections of 49.402–3 clearly apply to construction contracts, *see, e.g.,* 48 C.F.R. § 49.402–3(i), it is equally clear that the provision quoted above does not, but instead applies only to defaults involving supply and service or research and development contracts. A comparison of the default clauses for such contracts with the quoted language makes this apparent as only those clauses, and not the clause applicable to construction contracts, contain "[s]ubdivisions (a)(1)(ii) and (a)(1)(iii)." [4]  Observing this, the

Board of Contractor Appeals has repeatedly held that the cure provision quoted above does not apply to construction contracts. *See Appeals of ONI Construction, Inc.,* ASBCA Nos. 45,394, 46,087 & 46,303, 96–2 BCA ¶ 28,-277; *Appeal of White Buffalo Construction, Inc.,* AGBCA No. 90–133–1, 93–3 BCA ¶ 26,-236.

Finally, plaintiff argues that a cure notice requirement should be applied to the instant case based on "common law." It is true that contracts to which the government is a party generally are subject to the same rules of contract law as contracts between individuals and that, in some instances, this leads to the application of federal common law in interpreting and administering the contract. *See United States v. Standard Rice Co.,* 323 U.S. 106, 111, 102 Ct.Cl. 849, 65 S.Ct. 145, 89 L.Ed. 104 (1944); *Maxima Corp. v. United States,* 847 F.2d 1549, 1552 (Fed.Cir.1988). However, plaintiff cites no cases in support of its claim that a cure notice is required by common law. Some commentators indicate that, in some circumstances, the common law requires some notice before a contract is placed in default, *see* 6 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 898 (3d ed.1962); W. Noel Keyes, *Government Contracts,* § 49.12 (2d ed.1996), but there is no indication that that notice must be one offering an ability to cure. Here, a notice was provided in advance of the termination for default—albeit a show cause notice—and plaintiff cannot claim that it is entitled to any more under the common law.[5]

---

unsatisfactory performance indicated that the contractor was not "ready, willing and able to make progress."). *See also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 908–09 (3d ed.1998) (noting that the failure to conform to the contract specifications may lead to default under § 52.249–10); Walter F. Pettit, *Failure to Deliver or Perform,* in *Government Contract Default Termination* 3–1, 3–16 (Walter F. Pettit et al. eds.1991)(same).

**4.** Plaintiff argues that the reference to "Subdivisions (a)(1)(ii) and (a)(1)(iii) of the Default clause" modifies only the first part of the first sentence in the clause, dealing with situations when the contractor fails to perform "some of the other provisions of the contract," but does not modify the second part of that sentence, specifying termination procedures where a contractor "so fails to make progress as to endanger

performance of the contract." Plaintiff argues that this latter part of the sentence, unmodified by the subdivisions references, applies here, making the procedures in section 49.402–3(d) applicable to this fixed-price construction contract. However, this construction of the first sentence of section 49.402–3(d) does not follow because the language dealing with situations where a contractor "so fails to make progress" is taken directly from subdivision (a)(1)(iii) of the supply and service contract default clause. Accordingly, there is no indication whatsoever that the procedures in section 49.402–3(d) apply to fixed-price construction contracts, so as to create a cure notice requirement.

**5.** This court wishes to make clear that is not deciding that some form of notice is required before a contract is terminated for default. Indeed, the regulations are clear, and the commen-

Even were there significant evidence that state common law requires a cure notice in construction contracts, this court would be disinclined to elevate those authorities into federal common law and judicially rewrite the relevant regulation to insert a cure requirement therein. Based on the presence of cure notice requirements in other default provisions, but not in the provisions in question,[6] it cannot reasonably be claimed that the omission of a cure notice requirement was somehow an oversight. This is especially true given the longstanding-nature of these procedures.[7] For this court to rewrite the regulation, given the relative clarity of the Executive Branches' determination that a cure notice should not be required in such circumstances, would constitute, in this court's view, an abuse of its authority. Moreover, when plaintiff expressly agreed to the FAR procedures for default when it signed the contract, it, in the court's view,

thereby abrogated any common law right it might have had to a notice of cure. *See L & E Corp. v. Days Inns of America, Inc.*, 992 F.2d 55, 58 (4th Cir.1993) (noting that parties, by agreement, may abrogate common law principles). Thus, plaintiff's common law arguments are, for a variety of reasons, unavailing.

## III. Conclusion

For the foregoing reasons, this court DENIES plaintiff's motion for partial summary judgment and GRANTS defendant's cross motion for partial summary judgment.

---

tators reflect, that a show cause notice may, but need not, be given. *See* 48 U.S.C. § 49.402–3 ("If termination for default appears appropriate, the contracting officer *should, if practicable,* notify the contractor in writing of the possibility of the termination.")(emphasis added); Cibinic & Nash, *supra,* at 994–95.

**6.** It is well-established that "[p]rinciples of statutory interpretation apply to the interpretation of regulations." *DGS Contract Serv., Inc. v. United States,* 43 Fed.Cl. 227, 239 (1999). Under these rules of interpretation, when specific language is included in one section of a statute or regulation, but omitted from a relation section of the same statute or regulation, it is generally presumed that the omission was intentional. *See Russello*

*v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *Trevan v. Office of Personnel Management,* 69 F.3d 520, 525–26 (Fed.Cir. 1995).

**7.** Indeed, even prior to the promulgation of the FAR in 1984, the regulations governing default terminations for supply and service contracts included a notice requirement, while the similar provisions for construction contracts did not. *Compare, e.g.,* 41 C.F.R. § 1–8.602–3 (1970)(requiring a cure notice for failure to perform provisions of the contract or failing to make progress in a fixed-price supply contract), *with* 41 C.F.R. § 1.603(1970)(no requirement for a cure notice in the case of default termination of fixed-price construction contracts).