

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2005

# Joseph v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-2885

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Joseph v. Atty Gen USA" (2005). *2005 Decisions.* Paper 467.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/467

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>**AMENDED  PRECEDENTIAL**</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No:  04-2885

_____

MARC HILAIRE JOSEPH,

Petitioner

v.

ALBERTO GONZALES,* Attorney General
of the United States of America,

Respondent

*Substituted pursuant to Federal Rule of Appellate Procedure
43(c)(2)

_____

On Petition for Review
from the Board of Immigration Appeals
(No. A40-135-340)

Argued July 14, 2005

Before: SLOVITER, McKEE, and WEIS, <u>Circuit Judges</u>

(Filed September 20, 2005)

Jennifer H. Kim, Esq. (Argued)
Association of the Bar of the City of New York
Refugee Assistance Program
42 W. 44th Street
New York, NY 10036
*Attorney for Petitioner*


Peter D. Keisler, Esq.
Assistant Attorney General

Linda S. Wernery, Esq.
Senior Litigation Counsel

William C. Minick, Esq. (Argued)
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
*Attorneys for Respondent*

McKEE, Circuit Judge:

Marc Hilaire Joseph petitions for review of an order of the Board of Immigration Appeals dismissing his appeal from the Immigration Judge's determination that he is deportable as charged, and denying his claim of derivative citizenship. Joseph contends that he is not subject to deportation because he is a United States national. Alternately, he asks us to transfer this matter to the District Court for a *de novo* determination of his claim of United States citizenship pursuant to INA § 242(b)(5)(B), 8 U.S.C. § 1252(b)(5)(B). For the reasons that follow we will grant Joseph's petition for review, vacate the order of the BIA, and transfer the case to the appropriate District Court for adjudication.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Joseph was born in Haiti on July 5, 1973. He alleges that his mother was Rosemane Joseph.[1] According to Joseph, Rosemane became pregnant with him when she was 12 years old as a result of being raped by an unknown assailant. Joseph alleges that, due to the circumstances surrounding his birth, he

---

[1]Rosemane died before the commencement of the immigration proceedings at issue here.

3

was raised in Haiti by his grandparents – Rosemane's father, Hermann Joseph ("Hermann") and her mother, Lolita Clergé Joseph ("Lolita"). Hermann and Lolita are now deceased. He also claims that he grew up believing that Hermann and Lolita were his father and mother, and that Rosemane was his older sister. He maintains that he did not learn that Rosemane was actually his mother until he was 13 years old.

It is undisputed that Rosemane came to the United States in 1981 and settled in New Jersey. She married Angelo Morales, a United States citizen, in 1983. Morales filed a spouse petition for Rosemane, and she was admitted to the United States as an immigrant on March 23, 1985. On September 5, 1985, Morales filed a petition identifying Joseph as Rosemane's son, and his stepson. The Immigration and Naturalization Service ("INS")[2] approved the petition on October 7, 1985, and on February 15, 1986, Joseph was admitted to the United States; he was then 13 years old. Joseph maintains that he learned the truth about his mother some point

---

[2]On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security. *See* Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 (2002). The former INS was divided into three separate agencies: United States Immigration and Customs Enforcement; Bureau of Customs and Border Protection; and the United States Citizenship and Immigration Services.

after his arrival in the United States.[3] Rosemane was naturalized as a United States citizen when Joseph was 16 years old. Joseph now maintains that, as Rosemane's son, he derived citizenship through her.

Joseph's contact with the INS began after his 1995 and 1996 convictions in New Jersey for state criminal offenses, including crimes considered "aggravated felonies" under the INA. On January 2, 1997, the INS served Joseph with an Order to Show Cause charging him with being deportable under INA § 241(a)(2)(A)(iii) for his aggravated felony convictions, and under INA § 241(a)(2)(B)(I) for his conviction for a crime involving a controlled substance. At his initial deportation hearing on March 6, 1997, Joseph asserted that he had derived U.S. citizenship through his mother and was therefore not subject to deportation under the Act. His claim was rejected, and he was ordered deported to Haiti.

On January 31, 2001, Joseph filed a *pro se* motion to reopen, recounting his out-of-wedlock birth in Haiti and asserting that he obtained derivative citizenship, under INA § 321(a)(3), upon his mother's naturalization prior to his 18th birthday. On November 21, 2001, the IJ denied Joseph's motion to reopen, concluding that Haitian law precluded Joseph from benefitting from the out-of-wedlock provision of § 321(a)(3). The BIA dismissed Joseph's appeal of that decision because

---

[3]Rosemane's brother, Garry Joseph, testified at Joseph's immigration hearing that Joseph learned that Rosemane was his mother while he was still living in Haiti.

Haiti had eliminated all distinctions between legitimate and illegitimate children. In the BIA's view, it was therefore irrelevant under the Act whether his natural father acknowledged him since Joseph had been legitimated at birth and could therefore not derive U.S. citizenship pursuant to § 321(a)(3).

Thereafter, *pro bono* counsel filed a petition for review on Joseph's behalf. The petition alleged that the Civil Code of Haiti only legitimized children born out of wedlock who had been acknowledged by their natural father. Since Joseph's mother had been raped and his natural father was unknown, Joseph contended that he was never acknowledged by his natural father and could therefore not be considered legitimated under Haitian law. The government agreed.

On December 12, 2002, the U.S. Department of Justice, Office of Immigration Litigation, filed a motion for remand with this court. After additional filings with this court and the BIA that we need not detail for purposes of our decision, newly-reopened proceedings began in front of the IJ. One month later, the government issued a new charge of deportability against Joseph, charging him with deportability under INA § 241(a)(1)(A). The government now asserted that Joseph was excludable at the time of entry because Rosemane was not actually his mother. Rather, according to the government, she was really his elder sister, and Joseph was therefore Morales's brother-in-law rather than his stepson. Thus, the government claimed that Joseph's immigrant visa was invalid and introduced a series of documents and reports from Haiti to support this claim.

6

On December 29, 2003, in a written decision, the IJ agreed with the INS's position and ordered Joseph deported to Haiti based upon the judge's finding that Joseph was a deportable alien, and not a U.S. citizen. The BIA affirmed, and this petition for review followed.

## II. DISCUSSION.

### A. The IJ's Decision.[4]

The IJ reviewed the government's evidence including reports of an investigation into the circumstances surrounding Joseph's birth in Haiti. The IJ then recounted the testimony of each of the witnesses at the removal hearing including Joseph, Rosemane's brother Garry Joseph ("Garry") and Morales.

The IJ ruled that Joseph failed to prove derivative citizenship by a preponderance of the evidence. First, the IJ noted that Joseph did not submit any police or medical reports to confirm that Rosemane had been raped, nor had he submitted any evidence to establish that Rosemane had failed to attend school or that she had received medical care during her pregnancy. The IJ also commented on the fact that, although Garry had testified that Rosemane's rape and pregnancy were

---

[4] Although we are reviewing the decision of the BIA, not that of the IJ, the BIA's ruling cannot be understood in a vacuum, given its analysis. Thus, we must refer to the IJ's analysis in order to provide the proper context and background for our analysis of the BIA's ruling.

7

common knowledge in the neighborhood, no affidavits had been submitted from any neighbors.

The IJ gave little weight to Rosemane's spouse petition, concluding that, while the petition listed Joseph as Rosemane's child, this petition and the other U.S. immigration documents that named Joseph as Rosemane's child were not primary evidence of a mother-child relationship. Moreover, the IJ concluded that, because the documents were prepared by Joseph's family, they were self-serving. The IJ also questioned the validity of the September 1985 birth certificate Joseph submitted because the certificate named Rosemane as the mother and Hermann as the father, and Joseph failed to submit the civil judgment required for a delayed birth certificate to be issued in Haiti.[5]

---

[5]Under Haitian law:

> declarations of birth must be made to an official of the civil status of the locality where the birth occurred within one month of delivery, and the birth certificate must be drawn up immediately. If the birth has not been declared within two years after this legal deadline has run out, the birth certificate cannot be drawn up by an official of the civil status, except pursuant to a declaratory judgment pronounced by the civil court (*Tribunal Civil*) of the child's birthplace or, if this place is unknown, of the child's domicile.

In the IJ's view, Morales' testimony was not persuasive since Rosemane had not informed him of her "baby" in Haiti for several years, and Morales only knew of the circumstances of Joseph's birth through his conversations with Rosemane. Moreover, while the IJ thought Garry's testimony was generally consistent with Joseph's, the IJ noted that the testimony of the two was in conflict as to when Joseph learned that Rosemane was his mother and that she had conceived him as a result of being raped.[6] Additionally, the IJ noted that Garry was unable to give details about Joseph's birth, including whether Joseph was born at home or in the hospital. The IJ also found inconsistencies between Garry's affidavit and his testimony. In his affidavit, Garry explained that Hermann's name appeared as the natural father on Joseph's birth certificate "as a convenience" and "to expedite the request for a birth certificate." However, during his testimony, Garry said that Hermann put his name down as Joseph's father out of embarrassment because Joseph was "a child of violation or rape." Garry later explained that, due to his father's lack of education, he erred and should have attempted to get a birth of recognition instead of a birth certificate.[7] The IJ thought

---

[6]Joseph testified that he discovered that Rosemane was his mother after his arrival in the United States. Garry testified that Joseph was still living in Haiti when he learned of his relationship with Rosemane.

[7]According to Garry's testimony, a birth of recognition acknowledges an adopted or recognized child while a birth certificate indicates the existence of a natural father of the child.

9

Garry's testimony was vague and seemed rehearsed.

Conversely, the IJ found the government's evidence persuasive. He was particularly impressed with the government's overseas investigation report. That report contained: (1) a patients' record book from the Haiti University General Hospital of State dated July, 1973, stating that a patient named Janita Clergé gave birth to her fifth child on July 5, 1973; (2) comments from the investigator, Mrs. Lucienne D. Brutus, explaining that the Financial and Administrative Director of the Maternity Hospital of the University of Haiti concluded that the birth certificate submitted by Joseph, which purportedly came from the Hospital, did not in fact come from the Hospital; and (3) additional reports from Mrs. Brutus explaining that Dr. Edouard Viala, a prominent ob-gyn physician in Haiti, denied signing Joseph's submitted birth certificate and offered a sample of his own signature for comparison.

Joseph tried to have at least some of the documents in these reports excluded as "unsworn, uncorroborated, and unreliable" hearsay, arguing that any reliance on them would deny him due process and a fair hearing because he had no opportunity to cross-examine the witnesses. He based his argument on *Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003). However, the IJ admitted the reports into evidence citing 8 C.F.R. § 1240.46.[8] The IJ ruled that the strict rules of

---

[8]This section states, in relevant part:

*Use of prior statements.* The immigration judge

10

evidence are not applicable in deportation proceedings, and that Joseph's due process rights were not infringed because the reports offered by the government were relevant and probative as required by *Ezeaguwana*. The IJ explained that the reports were expeditiously served on Joseph; Mrs. Brutus's experience and credentials had been documented; Mrs. Brutus personally directed the investigation and provided a detailed account of it including a sample of authentic Haitian birth certificates; and Joseph had adequate time to make his own follow-up inquiries, submit written interrogatories and offer rebuttal evidence.

> The IJ concluded:
> Upon a careful review of the entire record, and after fully evaluating and weighing the evidence and arguments presented, the Court determines, on balance, that Joseph's evidence is insufficient to meet his burden of proof. Joseph has failed to establish that he derived United States citizenship by a preponderance of credible evidence. I conclude that Joseph is the child of Hermann Joseph and Zalita Clerge and the sister of Rosemane Joseph Morales. Joseph has failed to satisfy the requirements set forth in INA § 321(a)(3). Therefore, he has not derived United

----

may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

States citizenship. I further find that deportability has been established by clear, convincing, and unequivocal evidence under each of the four charges brought by the Department.

## B. The BIA's Decision.

In his appeal to the BIA, Joseph argued that (1) the IJ improperly considered the reports submitted by the government and (2) the IJ's adverse credibility findings were not supported by the record. With respect to the latter, the BIA found:

> the [IJ] did not make an explicit adverse credibility determination. Instead, the [IJ] found that the testimony presented by each witness was either insufficient to prove the respondent's claim or undermined by the documentary evidence in the record. Thus, as a matter of proof, not credibility, the [IJ] found that the testimony of [Joseph], his alleged uncle, and his alleged stepfather, was insufficient to meet his burden.

The BIA also rejected Joseph's argument that the IJ erred in relying upon the investigative report from Haiti. The BIA explained: "even absent reliance on the information contained in the hospital records, [Joseph's] claim is still undermined by other evidence in the record which suggests that Rosemane Joseph was his sister, not his mother." This "other evidence" included a portion of one of the investigator's reports that Joseph had not objected to. That portion of the report asserted that the birth certificate Joseph submitted was fraudulent. The

12

BIA noted that Joseph had not offered any evidence to rebut that assertion, nor had he submitted an authentic birth certificate or evidence that Rosemane Joseph gave birth on July 5, 1973. The BIA discredited the 1985 birth certificate Joseph submitted. The Board believed that the birth certificate was undermined by Hermann and Lolita's marriage certificate, which listed Joseph and Rosemane as brother and sister. The BIA concluded: "the record does not contain any reliable, consistent, or accurate evidence to prove that [Joseph] is the son of Rosemane Joseph through whom he claims to have derived United States citizenship."[9] This petition for review followed.[10]

---

[9]The BIA also denied Joseph's motion to remand to apply for deferral of removal under the Convention Against Torture, finding that Joseph could not establish a *prima facie* case for such relief. Joseph had argued that, due to his criminal conviction in the United States, he would be indefinitely detained once removed to Haiti, and it is more likely than not that he would be tortured once detained. Joseph does not appeal this part of the BIA's decision.

[10]On March 7, 2005, we denied Joseph's motion for a stay of removal, and on May 16, 2005 Joseph was removed from the United States to Haiti. The parties dispute whether, prior to the enactment of the REAL ID Act, which we discuss *infra*, we would have retained jurisdiction over Joseph despite his departure from the United States. This dispute is no longer relevant, however, since both parties agree that under § 242, we retain jurisdiction over Joseph's petition for review.

13

## III. JURISDICTION & STANDARD OF REVIEW.

After Joseph filed this petition for review, Congress enacted the Real ID Act. REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 106, 119 Stat. 231. Although the impact of that Act here is minimal, it does affect our jurisdiction.

Prior to the enactment of the REAL ID Act, our jurisdiction was controlled by the "transitional rules" for judicial review set forth in § 309 of IIRIRA, and those provisions of the former § 106 of the INA, 8 U.S.C. § 1105a (repealed 1996). However, pursuant to § 106(d) of the REAL ID Act, a petition for review filed under former § 106(a) of the INA is treated as if it had been filed as a petition for review under § 242 of the INA, 8 U.S.C. § 1252. We must treat Joseph's petition for review accordingly.

Thus, Joseph's citizenship claim is now governed by 8 U.S.C. § 1252(b)(5). That section provides:

Treatment of nationality claims

(A) Court determination if no issue of fact. If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

(B) Transfer if issue of fact. If the

14

petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

In determining whether a genuine issue of material fact is presented, our inquiry is the same as that which we employ in reviewing grants of summary judgment. *See Agosto v. INS*, 436 U.S. 748, 754-57 (1978). Thus, "a court of appeals cannot refuse to allow a *de novo* review of a citizenship claim if the evidence presented in support of the claim would be sufficient to entitle a litigant to trial were such evidence presented in opposition to a motion for summary judgment." *Id*. at 756; *see also Baeta v. Sonchik*, 273 F.3d 1261, 1265 (9th Cir. 2001) (same). Accordingly, the government, as the party seeking what amounts to summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Under this standard, we draw all factual inferences in favor of Joseph, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

15

# IV. ANALYSIS.

Given the aforementioned scope of review, we must determine if there is a genuine issue of material fact as to Joseph's claim of United States citizenship so as to warrant a *de novo* determination of that issue in the District Court.

Section 1432(a) of Title 8 sets forth the requirements for obtaining derivative United States citizenship. The relevant provision provides in part as follows:

> A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:
>
> . . . .
>
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
>
> (4) Such naturalization takes place while such child is under the age of eighteen years; and
>
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this

16

subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a), INA § 321(a) (repealed and superceded 2000).[11]

As we noted at the outset, Joseph maintains that he was born out-of-wedlock in Haiti and derived United States citizenship through his mother – Rosemane – who was naturalized before his eighteenth birthday. Joseph presented documentary evidence that included: (1) the spouse petition filed by Morales for Rosemane listing Joseph as Rosemane's son; (2) Joseph's birth certificate issued in 1985 listing Rosemane as his mother; (3) Rosemane's visa application from 1985 listing Joseph as her son; (4) the alien relative visa petition Morales filed for Joseph listing Joseph as his step-son; (5) Joseph's visa application from Haiti, listing Rosemane as his mother; (6) Joseph's immigrant visa and alien registration; (7) Rosemane's petition for naturalization listing Joseph as her son; (8) Rosemane's petition for alien relative for Lolita Joseph, which does not list Joseph as Lolita Joseph's child; and (9) Lolita Joseph's Haitian visa application, which does not list Joseph as

---

[11] Section 321(a) was repealed and superceded in 2000 by the Child Citizenship Act of 2000, Pub. L. No. 106-395, 114 Stat. 1631 (2000). However, Joseph claims to have derived citizenship in 1989, before § 321(a) was repealed. Consequently, the repeal has no bearing on our discussion.

17

her child.

Joseph's testimonial evidence included: (1) Garry's testimony explaining that he was home the night his family learned of Rosemane's rape, how he subsequently observed Rosemane's developing pregnancy, and how Joseph was raised by Hermann and Lolita as their own son; (2) Morales's testimony that he was sure that Joseph and Rosemane were mother and son; and (3) Joseph's testimony explaining Rosemane's rape, his understanding of his family structure as a child, and how, at the age of 13, he learned that Rosemane was his mother. Joseph also argues that the fact that he submitted to a blood test at the government's request is evidence that supports his contentions.

The government maintains that Joseph has not raised a genuine issue of material fact because his evidence is from secondary sources,[12] the testimonial evidence does not

_____

[12] In its brief, the government, like the IJ and the BIA, focused much of its attention on the fact that Joseph did not present "primary" evidence to support his claim. Such evidence, according to the government, includes police or medical reports that could confirm that Rosemane was raped in 1972, school records demonstrating Rosemane's failure to attend school during or after her pregnancy, and medical records indicating that Rosemane received medical care during her pregnancy. To his credit, counsel for the government stated at oral argument that he would not rely on that argument as he did not think it particularly probative. We agree. Regrettably, emphasis on such

"primary" evidence is yet another example of the cultural parochialism that sometimes creeps into the immigration proceedings we review.

Rosemane was allegedly raped in 1972, during the brutal dictatorship of Jean-Claude ("Baby-Doc") Duvalier. Common sense suggests that, during this period in Haiti's history, Haitians would have been most reluctant to get involved with police and report crimes, and this may especially have applied to rape. *See* Inter-American Commission on Human Rights, Organization of American States, *Report on the Situation of Human Rights in Haiti*, at http://www.cidh.oas.org/countryrep/Haiti88eng/chap.3.htm (Sept. 7, 1988); http://www.womenwarpeace.org/haiti/haiti.htm (last viewed Aug. 11, 2005).

Moreover, Haiti was, and continues to be, the poorest country in the Western Hemisphere and it is certainly fair to assume that only an extremely small number of Haitian adolescents attended school when Rosemane is alleged to have been raped. UC Atlas of Global Inequality, *Haiti, Education*, at http://ucatlas.ucsc.edu/country/84/education (last visited Aug. 11, 2005). Worse yet, given the reality that teachers and administrators must have had to confront in Haitian schools in 1972 - a reality that did not include compulsory education - it is totally unrealistic to think that the schools that did exist would maintain the kind of detailed attendance records that might reflect the absence or pregnancy of a young student. *See* Irwin P. Stotzky, *Symposium on the Role of a Free Press and Freedom of Expression in the Development and Consolidation of Democracies in Latin America*, 56 U. Miami L. Rev. 255, 283

19

support his theory, and the birth certificate he produced is unreliable. We disagree. We think this case is controlled by the Supreme Court's decision in *Agosto v. INS*, 436 U.S. 748 (1978). We think *Agosto* establishes that Joseph is clearly entitled to a *de novo* hearing in the District Court.

In *Agosto*, the Court evaluated a derivative citizenship

---

(Jan. 2002). Although that is not outside the realm of possibility, the government's reliance on the absence of school records is neither logical, appropriate, nor realistic absent some proof that it would be appropriate to expect such evidence to be available.

Similarly, if Rosemane was in fact pregnant in 1972, there is no reason to assume that she received prenatal care that might generate the kind of medical records that Joseph was expected to produce. Haiti, like many other developing countries, has a very high infant mortality rate, which, common sense suggests is directly related to the fact that so few women receive prenatal and postnatal care. *See* UC Atlas of Global Inequality, *Haiti, Health*, at http://ucatlas.ucsc.edu/country/84/health (last visited Aug. 11, 2005); http://www.nationmaster.com/country/ha/Health (last visited Aug. 11, 2005).

claim under former INA § 106(a)(5).[13]  Before the IJ, Agosto
provided testimonial evidence from himself and several other
witnesses, including his adoptive parents, Crocifessa and Pietro
Pianetti, and his half-brother. They testified in support of his
claim that he had been born to an unmarried Italian mother in
Ohio, and sent to Italy at a young age to reside with an Italian
couple.[14]  *Id*. at 758.  The government presented documentary

---

[13]Former INA 106(a)(5) stated:

whenever any petitioner, who seeks review of an order under
this section, claims to be a national of the United States and
makes a showing that his claim is not frivolous, the court shall
(A) pass upon the issues presented when it appears from the
pleadings and affidavits filed by the parties that no genuine issue
of material fact is presented; or (B) where a genuine issue of
material fact as to the petitioner's nationality is presented,
transfer the proceedings to a United States district court for the
district where the petitioner has his residence for hearing de
novo of the nationality claim and determination as if such
proceedings were originally initiated in the district court under
the provisions of section 2201 of title 28. Any such petitioner
shall not be entitled to have such issue determined under section
1503(a) of this title or otherwise . . . .

[14]This testimony explained that Agosto was the illegitimate
son of Crocifessa Pianetti's sister – Angela Porello – who left
her Italian husband and two daughters in 1921 to move to the
United States with her cousin.  Through correspondence with

21

evidence that undermined Agosto's evidence and tended to establish that he had instead been born in Italy to unknown parents in 1927, placed in a foundling home there, and ultimately adopted by an Italian couple.[15]  *Id*. at 757.

The IJ rejected Agosto's claim and the BIA affirmed.  In deciding the subsequent petition for review, the Court of

---

Angela, the Pianettis learned that petitioner had been born in Ohio, that his father was Salvatore Agosto, and that Angela could not care for him on her own.  Angela therefore sent petitioner to Italy to be raised by the Pianettis.  *Id*. at 758.

[15]The government's evidence included an entry from the City of Agrigento registry of births for 1927 relating that a 75-year-old handywoman appeared before the registrar and declared that "at 4:00 a.m. on the 17th day of [July] in a house situated in Via Oblati, of a woman who does not want to be named, a male child was born, which she presents to me and to whom she gives the first name of Vincenzo and the surname of Di Paola."  The registry also indicated that this child was sent to a foundling home.  The government also introduced a registry from the foundling home, which indicated that a Vincenzo Di Paola was born on July 16, 1927 and was consigned to Crocifessa and Pietro Pianetti on August 26, 1927.  *Id*. at 757.

The Pianettis testified that petitioner was never in the foundling home, but that the documents presented by the government concerning petitioner's birth in Italy were created by Angela's father to hide the fact that petitioner was his illegitimate grandson.  *Id*. at 758.

22

Appeals for the Ninth Circuit refused to transfer the case to the District Court for a *de novo* hearing on petitioner's citizenship claim and upheld the deportation order. *Id*. at 752. The court held that, because "[t]he evidence presented to the [IJ] does not disclose a colorable claim to United States nationality," Agosto had not presented "substantial evidence" in support of his citizenship claim. *Id*.

The Supreme Court reversed, holding:

The Service's proof that petitioner is not a United States citizen would certainly be sufficient, if uncontradicted, to establish his birth in Agrigento, Italy, in July 1927. However, the evidence adduced by petitioner to support his claim of American citizenship creates genuine issues of material fact that can only be resolved in a *de novo* hearing in the District Court.

*Id*. at 757.

The Court acknowledged that Agosto had told conflicting stories about his upbringing during the course of his immigration proceedings; however, the Court found that, given the obvious confusion and uncertainty surrounding the circumstances of Agosto's birth under either Agosto's or the government's theory, "it is hardly surprising that petitioner cannot say with any degree of certainty who his true parents might have been." *Id*. at 759-60. The Court found that the events, as recounted by Agosto and the witnesses who testified on his behalf, "while out of the ordinary, are not so

23

extraordinary as to compel disbelief in their occurrence,"
therefore the record established a genuine issue of material fact
regarding Agosto's citizenship, which the District Court had to
resolve. *Id*. at 760-61. The Court explained:

> Although as the trier of fact the District Court
> might reject the testimony of these witnesses
> because of their interest in the outcome, that
> determination has been committed by Congress to
> the district courts by § 106(a)(5)(B) of the Act
> and not to the courts of appeals.

*Id*. at 761.

That is precisely the situation here. Moreover, Joseph
and his witnesses have told one consistent version of his story
throughout the lengthy procedural history of this case, and the
documentary evidence introduced by Joseph supports his
account. Although the government's account contradicts
Joseph's evidence, the evidence Joseph submitted is "not so
extraordinary as to compel disbelief in their occurrence."[16]
Indeed, it is certainly possible that the documentary evidence
submitted by the government would be refuted by the testimony

---

[16]Of course, the District Court, as the trier of fact, might
reject the testimony of Joseph and his supporting witnesses
because of their interest in the outcome. However, "that
determination has been committed by Congress to the district
courts by [§ 242] of the Act," and is not for this court to decide.
*See id*. at 761.

24

of Joseph's witnesses if that testimony were accepted by the trier of fact. We therefore cannot reject Joseph's evidence as a matter of law. Accordingly, we conclude that the evidence adduced by Joseph in support of his claim of American citizenship creates genuine issues of material fact that can only be resolved in a *de novo* hearing in the District Court.[17] Anything less risks depriving Joseph of "one of the most precious [rights] imaginable" – his right to United States citizenship. *See Alexander v. INS*, 74 F.3d 367, 370 (1st Cir. 1996). "To deport one who . . . claims to be a citizen, obviously deprives him of liberty, . . . [and] may result also in loss of both property and life; or of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276 (1922).[18]

---

[17]Indeed, "where the evidence consists of the testimony of live witnesses concerning material factual issues, it will seldom if ever be appropriate to deny a de novo hearing, since '[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.'" *Id*. at 757(quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962)).

[18] As noted above, Joseph also argues that his due process rights were violated when the government was permitted to introduce certain documents from the Haitian investigator's report. We need not decide that issue here as Joseph will receive a *de novo* hearing on his claim in the District Court. If the government chooses to introduce these documents again during those proceedings, and if Joseph objects, the District Court can resolve that issue in the proper context.

## V. CONCLUSION.

For the reasons set forth above, we believe a genuine issue of material fact exists as to Joseph's derivative citizenship claim, and we will therefore grant his petition for review, vacate the order of the BIA and remand the case to the United States District Court for the District of New Jersey for further proceedings.

26