PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-1049

ARTURO NICOLA ESPICHAN,
AKA Arturo Espichan Izaguirre,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge: Leo Finston
(No. A042-288-321)

Argued September 24, 2019

Before: McKEE, AMBRO, and ROTH, Circuit Judges

(Opinion filed: December 27, 2019)

Kristina C. Ivtindzioski (Argued)
161 Madison Avenue
Third Floor
Morristown, NJ  07960

      Counsel for Petitioner

Joseph H. Hunt
   Assistant Attorney General, Civil Division
Stephen J. Flynn
   Assistant Director, Office of Immigration Litigation
Arthur L. Rabin (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC  20044

      Counsel for Respondent

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

### INTRODUCTION

Arturo Nicola Espichan came to the United States from Peru as a 14-year-old to live with his father, who shortly after became a U.S. citizen. When the Government later sought to deport Espichan for having committed an aggravated felony, he claimed he was not an alien but a U.S. citizen, having

derived citizenship from his father under a then-existing statute—§ 321(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1432(a) (repealed 2000). To meet that provision's requirements, Espichan needs to show that his parents had a "legal separation." The Government claims he cannot do so because, to be separated legally, you must first be married, and it asserts Espichan's parents were not.

Because Espichan's nationality claim presents a genuine issue of material fact—whether his parents were married—we transfer the case to a U.S. district court for a hearing and decision on that issue. If the court finds that Espichan's parents were married, then we hold as a matter of law that Espichan has satisfied all requirements under § 1432(a)(3)–(5) for derivative citizenship and so may not be removed.

## I. BACKGROUND

The following facts are not in dispute. Espichan is a native and citizen of Peru born in May 1975 to German Espichan and Margarita Izaguirre. His father came to the U.S. as a lawful permanent resident in 1979. He got custody of Espichan in August 1986 per a power of attorney signed by Espichan's mother at the U.S. consulate in Peru. In February 1990, Espichan's mother filed a complaint at the police headquarters in Callao, Peru, declaring as a matter of public record that she and Espichan's father, having lived together since 1970, separated in 1979.

Espichan's father petitioned for him to come to the U.S. as a lawful permanent resident, and Espichan, then 14, arrived in March 1990. Later that month, his father became a U.S. citizen.

3

Fast forward to 2016, when the Department of Homeland Security ("DHS") charged Espichan with being an alien convicted of an aggravated felony, hence subject to removal under § 237(a)(2)(A)(iii) of the INA, 8 U.S.C. § 1227(a)(2)(A)(iii).

Espichan contested his removability before the IJ at his removal hearing, arguing that he had acquired derivative citizenship through his father under 8 U.S.C. § 1432(a)(3), the applicable law at the time of his alleged naturalization, *see Morgan v. Att'y Gen.*, 432 F.3d 226, 230 (3d Cir. 2005), because his parents were legally separated at the time of his father's naturalization. The IJ rejected this claim, finding there could be no legal separation because DHS came forward with "unequivocal evidence" that Espichan's father "never held himself out to be married" to Espichan's mother. Accordingly, he concluded that Espichan had not established U.S. citizenship and ordered him removed to Peru. The Board of Immigration Appeals ("BIA") affirmed, and Espichan petitions us for review.

## II. JURISDICTION AND STANDARD OF REVIEW

8 U.S.C. § 1252(b)(5) allows judicial review of removal orders in the appropriate court of appeals when the nationality of the petitioner is uncertain and gives us jurisdiction over that issue. *See Dessouki v. Att'y Gen.*, 915 F.3d 964, 966 (3d Cir. 2019). If "from the pleadings and affidavits" we believe that "no genuine issue of material fact about the petitioner's nationality is presented," then we "shall decide the nationality claim." 8 U.S.C. § 1252(b)(5)(A). If, however, there is a genuine issue of material fact about the petitioner's nationality, per 8 U.S.C. § 1252(b)(5)(B) we "transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing."

4

While our review of the nationality claim is unrestricted, it is limited to questions of law. *See Morgan*, 432 F.3d at 229. Where the "'BIA's opinion directly states that the BIA is deferring to the IJ, or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions,' we review both decisions." *Uddin v. Att'y Gen.*, 870 F.3d 282, 289 (3d Cir. 2017) (internal citation omitted). Here the BIA invoked specific aspects of the IJ's decision, so we review both decisions to determine whether a genuine issue of material fact exists as to Espichan's nationality.

## III. ANALYSIS

On his petition for review, Espichan asks us to decide his nationality claim as a matter of law, as he contends he has proven that his parents had a *de facto* marriage and, subsequently, a legal separation under Peruvian law. In the alternative, he argues that he has presented at the least a genuine issue of material fact as to his nationality that should be decided by a district court. Before turning to the claim itself, we address the appropriate standard to determine whether a genuine issue of material fact exists.

### A. We Use the Summary Judgment Standard When Determining Whether a Genuine Issue of Material Fact Exists.

*Joseph v. Att'y Gen.*, 421 F.3d 224, 229 (3d Cir. 2005), points the path to determine whether there is a genuine issue of material fact about Espichan's nationality. It adopts our typical summary judgment standard: the moving party "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law;" and "all factual inferences [flow] in favor of . . . the nonmoving party." *Id.* at 230 (internal citation omitted). Here the Government is the moving party

5

because it is seeking "what amounts to summary judgment" in terms of having Espichan declared removable. *Id.*

The Government, however, contends that our case *Bagot v. Ashcroft*, 398 F.3d 252 (3d Cir. 2005), controls on whom the burden rests because we are making a citizenship determination. According to *Bagot*, the "burden of proof of eligibility for citizenship is on the applicant," and so "[a]ll doubts 'should be resolved in favor of the United States and against the claimant." *Id.* at 256–57 (internal citation omitted). The Government attempts to distinguish *Joseph* on the ground that it is "on weaker footing than *Bagot* when it comes to inferences" because *Joseph* fails "to acknowledge or account for the Supreme Court's admonition in *United States v. MacIntosh* that '[c]itzenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant.'" Gov. Br. at 17 n.7 (quoting *United States v. MacIntosh*, 283 U.S. 605, 626 (1931)).

This argument fails for two reasons.

First, in *Joseph* we were determining under § 1252(b)(5)(B) whether a genuine dispute of material fact existed as to that petitioner's nationality, making it appropriate to transfer the case to a district court. 421 F.3d at 229-230. In *Bagot*, by contrast, we were determining the merits of a nationality claim itself that came to us on a habeas petition. 398 F.3d at 253-54. Thus, while it is appropriate to place the burden of proving citizenship on the applicant when deciding the merits of a nationality claim, the case directly on point here, *Joseph*, tells us that the burden is on the Government to show there is no genuine dispute of material fact that requires resolution by the factfinder.

6

Second, *Joseph* is on no weaker footing than *Bagot* when it comes to Supreme Court precedent. The former relied on the Supreme Court's decision in *Agosto v. INS*, 436 U.S. 748 (1978), which interpreted § 106(a)(5)(B) of the INA (repealed 1996)[1]—the predecessor to our current jurisdictional statute that uses language almost identical to that in § 1252(b)(5). *Agosto* determined that because the "statutory language [in § 106(a)(5)(B)] is virtually identical to that embodied in Fed. Rule Civ. Proc. 56, which governs summary judgment motions," it is reasonable to "assume that, in using the language from Rule 56 as the standard for granting *de novo* district court hearings on citizenship claims, Congress intended the language to be interpreted similarly to that in Rule 56." *Id.* at 754. When *Agosto* was decided, it was well established that, on Rule 56 motions for summary judgment, the burden to show

---

[1] § 106(a)(5)(B) of the INA (repealed 1996) provided that

> whenever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of title 28. . . .

the absence of a genuine issue of fact was on the moving party and all inferences were in favor of the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Additionally, *Agosto*, which was decided long after *MacIntosh*, made no mention of the earlier case's admonition regarding the high burden of proving citizenship when considering whether we should use the summary judgment standard and draw all inferences in favor of the nonmoving party.

Accordingly, in determining whether a petitioner's nationality presents a genuine issue of material fact, we follow *Joseph*'s directive and require the Government to demonstrate that there is a lack of such an issue while drawing all inferences in favor of the petitioner. When deciding the merits of such a claim, however, *Bagot* controls and the burden of proving citizenship is on the petitioner.

## B.  Espichan's Nationality Claim

We now come to the heart of the case: whether Espichan's nationality claim presents a genuine issue of material fact to warrant a fresh hearing by a district court. Espichan claims that he derived citizenship through his father under 8 U.S.C. § 1432(a)(3). It provides in relevant part that citizenship is automatically acquired by a child born outside the U.S. to alien parents on "[t]he naturalization of the parent having legal custody of the child when there has been a legal separation of the parents."[2]

---

[2] The child must also be under the age of 18 at the time of the naturalization and have been residing in the United States "pursuant to a lawful admission for permanent residence" at the time of the parent's naturalization. 8 U.S.C. § 1432(a)(4)–(5). Neither party disputes that Espichan has satisfied these conditions.

While § 1432(a) refers only to a "legal separation" between an alien's parents for derivative citizenship, we have interpreted the statute, no doubt out of logic, to require a marriage as the requisite antecedent to a "legal separation." *See, e.g.*, *Dessouki*, 915 F.3d at 967 ("Dessouki bases his citizenship claim on his father's naturalization [under § 1432(a)]. But the relevant law requires his parents to have once been married."). Accordingly, our first step is to determine whether the evidence in the record presents a genuine issue of material fact as to the marriage of Espichan's parents. If so, we may turn to whether there was a legal separation.

### 1. *The Record Presents a Genuine Issue of Material Fact Whether Espichan's Parents Were Married.*

At the time Espichan's parents were allegedly married, they both lived in Peru, so Peruvian law controls. *Morgan*, 432 F.3d at 234. That law expressly recognizes *de facto* marital unions. The Peruvian Civil Code of 1936, the law in effect when Espichan claims his parents were married, provided for and defined marital union in fact as "[t]he stable union of a man and a woman, free from any impediment to marry, who make up a *de facto* household in compliance with the time and conditions foreseen by the law, resulting in a community property subject to the regime of conjugal partnership where applicable." J.A. 91. Similarly, Article 326 of the Peruvian Civil Code of 1984, the law in force at the time of Espichan's father's U.S. naturalization in 1990,[3] provides that a "union in

---

[3] Under *Morgan* the applicable law is that "in effect at the time the critical events giving rise to the claim for derivative citizenship occurred." 432 F.3d at 230. Thus, while the Civil Code of 1936 governed the actual marriage itself, the Civil Code of 1984 governed at the time Espichan's father sought to

9

fact, voluntarily made between a man and a woman, free of matrimonial impediment, to achieve purposes and fulfill duties similar to those of marriage, originates a society of assets subject to the regime of community of acquisitions." J.A. 79. Article 9 of the Peruvian Constitution of 1979 also explicitly recognizes a *de facto* marriage—a "union of a man and a woman, free from any impediment to marriage, who form a *de facto* family . . . leads to a property system subject to the marital property system." J.A. 75.

Espichan presented documentary evidence in the form of affidavits signed in 2018, a 1990 police report, and a legal memorandum prepared by a Peruvian law firm, tending to show that his parents had a *de facto* marriage under Peruvian law. He presented his mother's affidavit attesting that in 1970 she "got married in Pusacocha Lagoon, according to the Pashas Culture [part of the Incan Indian community], with a simple ceremony," and that "[a]long with Mr. German Espichan, we accepted to be married under the tradition of the Pashas." She also declared that "I started a married life with Mr. German Espichan, making then a legal coexistence." J.A. 56. Espichan then introduced his father's affidavit attesting that "[i]n Peru, I maintained a convivial relationship with Ms. Margarita Izaguirre, which we initiated since September 23, 1970," and "we accepted to having a traditional matrimony . . . at the Pusacocha Lagoon, according to the traditions of the Pashas culture, with a simple ceremony." J.A. 60. Further, he declared that "[s]ince that September 23, 1970, [I] started a married life with Mrs. Margarita Izaguirre, making a legal

---

naturalize. Both, however, recognize a *de facto* marriage. *See also Minasyan v. Gonzales*, 401 F.3d 1069, 1077 (9th Cir. 2005) (looking at the marital law in place in California, the relevant jurisdiction, at both the time of naturalization and marriage).

10

coexistence." J.A. 60. Espichan also submitted his aunt's affidavit attesting that she attended his parents' traditional marital ceremony. J.A. 63.

That was not all. Espichan presented a police complaint filed by his mother in February 1990 declaring that "German Nicolas Espichan Bondani [and] . . . Margarita Justina Izaguirre Soto . . . lived together from 1970 to 1979" and "during the years of living together [] had three children." J.A. 49. Finally, Espichan introduced a legal memorandum from a law firm in Peru summarizing the provisions of Peruvian law that recognize *de facto* marital unions, explaining that they are a "deep-rooted custom," and concluding that Espichan's parents had formed a "*de facto* marital union" under Peruvian law. J.A. 91, 94.

The Government, on the other hand, argues that, as a matter of law, Espichan's parents were never married because DHS presented evidence to the IJ tending to show that there was no marriage. It points to three items: First, Espichan's father's Application to File Petition for Naturalization did not list a marriage to Espichan's mother despite listing three other marriages. J.A. 51. Second, Espichan's mother's Application for Naturalization indicated that she was "Single, Never Married." A.R. 624. And finally, a 1989 affidavit signed by Espichan's father (submitted as part of his efforts to obtain legal status for his son) declared that he had never been married to Espichan's mother. J.A. 53.

The Government disputes the credibility of Espichan's evidence in an attempt to show there is not a genuine dispute of material fact. But under *Joseph* we refrain from making credibility determinations and draw all inferences in favor of Espichan. 421 F.3d at 231–32. He offers plausible explanations for why his parents failed to state that they were married—for example, they may not have understood that

11

"marriage" as written on their official immigration forms included *de facto* marriages. *See* Pet'r Br. at 12–13. But that is not for us to decide. Thus there is a genuine dispute of material fact whether Espichan's parents were married under Peruvian law.

2. *If Espichan's Parents Were Married, Then Their Separation Is a "Legal Separation" Under § 1432(a)(3) as a Matter of Law.*

Even if Espichan's parents were married (and we assume so in this Section), we must still decide the issue of legal separation that occurs "only upon a formal governmental action . . . that[,] under the laws of a state or nation having jurisdiction over the marriage, alters the marital relationship of the parties." *Morgan*, 432 F.3d at 234. In *Morgan* the laws of the relevant jurisdictions—Jamaica and Pennsylvania—both required a formal judicial decree for legal separation. *Id.* at 233–34. But we expressly acknowledged that there may be a case where the relevant jurisdiction does not require any "governmental imprimatur" for parties to become "legally separated." *Id.* at 234 n.4. This is that case.

Article 326 of the Peruvian Civil Code of 1984 provides that "[a] union in fact ends by death, absence, mutual agreement, or unilateral decision." J.A. 79. And here Espichan gave evidence showing that his parents dissolved their *de facto* marital union under Peruvian law. He introduced the police complaint filed with the Callao Police Headquarters in February 1990 stating that "German Nicolas Espichan Bondani" and "Margarita Justina Izaguirre Soto" "let it be known having lived together from 1970 to 1979 and by mutual agreement have made the decision to separate." J.A. 49.

The Government disputes this characterization of the police complaint. But its arguments come up short. First, it

12

contends the police complaint is more akin to a child custody determination because the complaint includes a reference to the couple's children ("likewise it is known that during the years of living together they had three children . . ."). J.A. 49. But this overlooks that, several years prior to filing the complaint, Espichan's mother signed a power of attorney granting full custody of Espichan to his father. J.A. 47. Second, the Government casts doubt on the mutual nature of the separation, arguing that it is not clear that Espichan's father was a party to the police complaint. Yet this does not show that the complaint was not mutual, especially in light of the 2018 affidavit in which Espichan's father declared that "I have true knowledge that my ex-wife, Ms. Margarita Izaguirre[,] presented to the Commissary of Callao, on February 19, 1990, a document with the purpose of giving validity to the separation by mutual agreement." J.A. 61. Moreover, Peruvian law does not require separations to be mutual—a *de facto* marriage may end by "unilateral decision." J.A. 79.

Because the Government has failed to rebut Espichan's evidence tending to show that his parents had a legal separation, there is no genuine issue of material fact, and we may decide the issue as a matter of law. 8 U.S.C. § 1252(b)(5)(A).

Espichan now bears the burden of proving the merits of his citizenship claim by a preponderance of the evidence. *See Bagot*, 398 F.3d at 256; *In re Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 164 (BIA 2001). He has met his burden insofar as the legal separation issue is concerned. The police complaint, an official record with a clear declaration of separation, demonstrates by a preponderance of the evidence that his parents had a legal separation under Peruvian law in 1979, 11 years before his father naturalized.

13

Accordingly, if the District Court finds that the parents of Espichan were married, then he would have fully satisfied § 1432(a)(3)'s requirement for a legal separation. And because there is no dispute as to the other requirements for § 1432(a) derivative citizenship, Espichan would have met his burden of proving that he derived U.S. citizenship through his father.

\* \* \* \* \*

Whether the parents of Espichan were married is a genuine issue of material fact, and he has demonstrated that a legal separation occurred in the event his parents are found to have been married. We therefore vacate the BIA's decision affirming the IJ's denial of Espichan's citizenship claim and transfer this petition for review to the District of New Jersey (where Espichan is currently detained) for a *de novo* hearing. The sole issue is whether his mother and father were married under Peruvian law. *See Rosales v. Lynch*, 821 F.3d 625, 631–32 (5th Cir. 2016). If not, he loses. But if the District Court finds that they were married, then, as a matter of law, Espichan has satisfied 8 U.S.C. § 1432(a)(3)'s "legal separation" requirement, and he will have met his burden of proving derivative U.S. citizenship. Because an American citizen is not removable under 8 U.S.C. § 1227(a)(2), the District Court should then enter a final judgment terminating removal proceedings. *See* 28 U.S.C. § 2201(a) (granting district courts the authority to create a remedy with the force of a final judgment).

We retain jurisdiction over this case if there is a further appeal.

14